UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

MILAGROS ROMAN,

**MEMORANDUM AND ORDER**
10-CV-3085 (SLT)
Not for Publication

Plaintiff,

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ SEP 28 2012 ★

-against-

MICHAEL ASTRUE, COMMISSIONER
OF SOCIAL SECURITY

Defendant.

BROOKLYN OFFICE

-------------------------------------------------------------------x

**TOWNES, United States District Judge:**

Milagros Roman ("Plaintiff") commenced the instant action on July 6, 2010 pursuant to

42 U.S.C. § 405(g), seeking reversal of a final decision by the Commissioner of Social Security

(the "Commissioner") denying her application for disability insurance benefits under the Social

Security Act. On December 2, 2010, Plaintiff moved for judgment on the pleadings pursuant to

Fed. R. Civ. P. 12(c). On May 24, 2011, the Commissioner cross-moved for judgment on the

pleadings.[1] For the reasons stated below, the instant case is reversed and remanded for further

proceedings consistent with this Memorandum and Order. Plaintiff's motion is granted to the

extent of the request for the case to be remanded but denied in all other respects. The

Commissioner's motion is denied in all respects.

---

[1] The Commissioner's cross-motion for judgment on the pleadings is dated March 15,
2011 but was filed on May 24, 2011.

1

## I.    BACKGROUND

### A.    Procedural History

On October 29, 2002, Plaintiff filed an application for disability insurance benefits with the Social Security Administration (the "SSA"). (Administrative Record ("A.R.") at 11, 41, 95-97 (application)) The SSA initially denied Plaintiff's application on March 4, 2003. (A.R. at 54-57) Following a February 3, 2005 hearing at which Plaintiff appeared *pro se*, Administrative Law Judge Hazel C. Strauss (the "ALJ") issued her first decision on May 16, 2005 finding that Plaintiff was not "disabled" within the meaning of the Social Security Act, 42 U.S.C. § 423(d)(1)(A), and therefore not entitled to disability insurance benefits. (A.R. at 45-53 (first ALJ decision)) Plaintiff requested review of the ALJ's decision on July 6, 2005, which request was granted by the Appeals Council. (A.R. at 68, 80) The Appeals Council vacated the ALJ's May 16, 2005 decision and remanded the case on grounds that, *inter alia*, the ALJ failed to obtain medical records from Dr. David Kessler, the treating physician for Plaintiff's asthma condition. (A.R. at 80)

On remand from the Appeals Council, a supplemental hearing was held on June 26, 2008 before the ALJ, at which Plaintiff was represented by counsel.[2] (A.R. at 84, 1001-90 (hearing tr.)) The ALJ issued a second decision on August 28, 2008, again denying Plaintiff's application for social security benefits after finding that Plaintiff was not disabled within the meaning of the Social Security Act. (A.R. at 28-38) On September 25, 2009, Plaintiff requested review by the Appeals Council of the second decision issued by the ALJ. (A.R. at 11-18, 21, 23) On May 14, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's second decision.

---

[2] Plaintiff engaged counsel on July 6, 2005. (A.R. at 69)

2

(A.R. at 6-9). Pursuant to Section 205(g) of the Social Security Act, codified at 42 U.S.C. § 405(g), Plaintiff filed the instant action on July 6, 2010 for purposes of obtaining judicial review of the second and final decision issued by the ALJ.

### B.    Factual History

#### 1.    Plaintiff's Profile

Plaintiff, born on May 5, 1962, is a 4'11", 170-pound[3] English- and Spanish-speaking female with a GED. (A.R. at 11, 95, 98, 112, 117, 228, 654, 664, 660) From 1988 to 2001, Plaintiff worked first as a driver of handicapped people and subsequently as a transit bus driver. (A.R. at 11, 114, 128, 1046, 1048-49) From July 1997 to July 2001, Plaintiff was employed by the New York City Transit Authority (the "Transit Authority"). (A.R. at 114, 1046) On April 27, 1999, the bus Plaintiff was operating was involved in an accident, during which Plaintiff sustained injuries to the left shoulder and the neck. (A.R. at 113, 166) Dr. Scott Gray, Plaintiff's treating orthopedic surgeon, performed an operation on Plaintiff's left shoulder on December 28, 1999. (A.R. at 215-16) On April 9, 2000, Plaintiff suffered a second work-related injury to her left shoulder and neck during another bus accident. (A.R. at 149, 154, 166, 172) Dr. Gray performed a second surgery and arthroscopic inspection of Plaintiff's left shoulder on October 19, 2000. (A.R. at 209-12) On June 25, 2001, Plaintiff resumed her employment with the Transit Authority but was reclassified as a bus cleaner. (A.R. at 154, 166, 167) Plaintiff remained in this capacity until she ceased engaging in substantial gainful activity on July 15, 2001, the alleged onset date, on which she suffered a third injury to the left shoulder while sweeping a bus. (A.R. at 11, 29, 31, 113, 149, 157, 179)

---

[3] Plaintiff's weight fluctuated during the relevant period from 160 pounds to 180 pounds. (A.R. at 112, 150, 228, 568-75, 606-15).

In addition to impairments of the left shoulder and the neck, Plaintiff has a documented asthma condition (A.R. at 513-20, 538-43, 547-48) that caused her to be hospitalized for five days in June 2004 (A.R. at 285-320) and led to several visits to a hospital emergency room (A.R. at 280, 657, 664). Plaintiff was also diagnosed with major depression by Dr. Teresita Ruiz, her treating psychiatrist; her psychiatric impairment appears to be related partially to post-injury unemployment (A.R. at 345, 374, 376, 529).

It is undisputed that Plaintiff's date last insured is December 31, 2006, as provided under Title II of the Social Security Act. (A.R. at 11, 29, 31) Thus, Plaintiff is entitled to disability insurance benefits only if she is able to establish that her disability came into existence prior to December 31, 2006. *See Pluck v. Astrue*, 2011 WL 917654, *16 n.11 (E.D.N.Y. Mar. 9, 2011) ("The last date on which a claimant is insured under Title II is known as her 'date last insured.' A claimant is entitled to benefits only if she became disabled prior to her date last insured.") (citing *Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989)); *see also Arnone*, 882 F.2d at 37 ("To be eligible for disability insurance benefits, an applicant must be 'insured for disability insurance benefits.'") (quoting 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1)). Therefore, the existence of a disability with an onset date of December 31, 2006 or later would not qualify Plaintiff for disability insurance benefits.

### 2. Left Shoulder and Neck Impairments

#### a. Diagnostic Test Results

An initial MRI was performed on Plaintiff's left shoulder on May 24, 2000. (A.R. at 174) The related report indicated that her left shoulder suffered from 1) "rotator cuff tendinitis," 2) "acromioclavicular joint degenerative disease with marginal osteophytes noted impinging upon the musculotendinous junction of the rotator cuff," and 3) "minimal joint effusion." (A.R.

at 174) A second MRI of the left shoulder was performed on August 9, 2001, which – consistent with the results of the first MRI – revealed degenerative change, inflammation and impingement at the acromioclavicular joint. (A.R. at 213) Results of electrodiagnostic studies performed in January 2001, however, were negative. (A.R. at 154)[4] Similarly, a radiographic examination of the left shoulder performed on November 19, 2002 did not uncover any abnormalities. (A.R. at 230)

A May 22, 2000 MRI of the cervical spine revealed "straightening of the cervical spine probably secondary to muscular spasm and/or strain." (A.R. at 175). However, two radiographic examinations of the cervical spine performed on November 20, 2002 and August 14, 2005, respectively, identified no abnormalities. (A.R. at 231, 672, 675)

**b.      Medical Opinion of Dr. Gray, Treating Orthopedic Surgeon**

In a December 28, 1999 operative report prepared following the first surgery and arthroscopic inspection of Plaintiff's left shoulder, Dr. Scott Gray, Plaintiff's treating orthopedic surgeon, diagnosed partial rotator cuff tear and impingement syndrome of the left shoulder. (A.R. at 215-16) Dr. Gray noted degenerative changes of the shoulder joint and "a dense synovitis and bursitis" in the area. (A.R. at 215) The doctor indicated in the operative report that MRI results were "consistent with superior impingement and partial rotator cuff tear." (A.R. at 215)

Dr. Gray performed a second surgery on Plaintiff's left shoulder on October 19, 2000. (A.R. at 209-12) The attendant arthroscopic inspection revealed a partial tear of the left rotator

---

[4] The record does not contain any reports of the January 2001 electrodiagnostic studies; however, one of the independent orthopedic evaluation reports prepared by Dr. John Mazella, a consulting orthopedic surgeon engaged by the Workers' Compensation Board, indicates that such studies had been performed. (A.R. at 154).

cuff. (A.R. at 209) Dr. Gray discovered "a chondral lesion in the humeral head just below the rotator cuff" and "gross hemorrhagic changes in the cuff." (A.R. at 209) Plaintiff suffered an asthmatic attack during the second operation, which led to her hospitalization immediately thereafter. (A.R. at 201, 210) Minimal positive response to the second operation was observed, as compared to the first operation. (A.R. at 197, 198)

The administrative record contains twenty treatment reports prepared by Dr. Gray, with dates ranging from September 25, 2000 to October 7, 2002. (A.R. at 188 (September 25, 2000 report), 202 (duplicate September 25, 2000 report), 201 (November 25, 2000 report), 200 (January 5, 2001 report), 199 (January 26, 2001 report), 265 (duplicate January 26, 2001 report), 198 (June 4, 2001 report), 196-97 (June 29, 2001 report), 195 (August 6, 2001 report), 194 (August 10, 2001 report), 193 (August 17, 2001 report), 192 (September 7, 2001 report), 189 (September 24, 2001 report), 187 (November 2, 2001 report), 186 (November 26, 2001 report), 185 (January 14, 2002 report), 184 (January 21, 2002 report), 183 (March 18, 2002 report), 182 (April 8, 2002 report), 181 (September 27, 2002 report), 180 (October 7, 2002 report), 179 (October 7, 2002 report relating to July 15, 2001 injury)).

Fourteen such reports were prepared between July 15, 2001, the alleged onset date, and December 31, 2006, the date last insured. (A.R. at 179-87, 189, 192-95) During this period, Dr. Gray consistently observed and diagnosed limited range of motion in the left shoulder, pain, tenderness, muscular atrophy, swelling and resultant difficulties with overhead activities. *See id.* Consistent with the foregoing symptoms and diagnoses, Dr. Gray declared Plaintiff to be totally disabled in several treatment reports. (A.R. at 183, 187, 188, 193) He scheduled a sixty percent loss of use of the left shoulder, attributing a thirty-percent loss of use to the April 9, 2000 accident and the remaining percentage in loss of use to the July 15, 2001 onset. (A.R. at 179

("The patient has a permanency in her shoulder, a percentage of loss of use has been given."), 181, 182)

Dr. Gray completed a bilateral manual dexterity impairment questionnaire on December 15, 2005, in which he listed chronic synovitis of the left shoulder and cervical radiculopathy as his diagnoses.[5] (A.R. at 585-90) He noted reduced grip strength, tenderness, swelling, loss of sensation, loss of fine coordination in the left hand (A.R. at 585) and pain in the neck, left shoulder and left arm (A.R. at 586). Based on the foregoing diagnoses and symptoms, Dr. Gray opined that Plaintiff possessed the ability to lift or carry objects weighing up to five pounds on an occasional basis. (A.R. at 587) He further opined that Plaintiff suffered from marked bilateral[6] limitations in her ability to push, pull, grasp, turn, twist objects, perform fine manipulations and use her arms for reaching. (A.R. at 589) In addition, it was noted that Plaintiff's condition would interfere with her ability to keep her neck in a constant position, such that she would not be able to view a computer screen or look down at the work desk on a sustained basis. (A.R. at 588) Furthermore, her symptomatology and pain reportedly would increase with significant repetitive reaching, handling or fingering (A.R. at 588).[7]

---

[5] Dr. Gray also listed severe sleep apnea, depression and severe asthma as his diagnoses; however, there is no evidence in the record that he treated Plaintiff for any of the foregoing medical conditions. (A.R. at 585) Furthermore, Plaintiff does not dispute that she did not suffer from sleep apnea prior to December 31, 2006, her date last insured. (A.R. at 1022) Therefore, any disability that may be established based upon Plaintiff's sleep apnea cannot form the basis for Plaintiff's entitlement to disability insurance benefits. *See Pluck*, 2011 WL 917654, at *16 n.11.

[6] The impairment questionnaire and treatment reports prepared by Dr. Gray contain no indication that Plaintiff ever suffered any impairment in her right upper extremity. (A.R. at 179-87, 189, 192-95, 585-90) Thus, the bilateral notations appear to have been made in error.

[7] Dr. Gray also stated that Plaintiff needed to avoid wetness, temperature extremes, heights, kneeling and bending, and she suffered from psychological limitations.

In his final report, dated March 13, 2008, Dr. Gray reiterated that Plaintiff's left shoulder was only capable of a limited range of motion and exhibited strong positive impingement, weakness and moderate swelling. (A.R. at 1000) Dr. Gray reported a "permanent disability" that failed to improve despite "surgery, aggressive PT, and pain medications." (A.R. at 1000)

### c. Medical Opinion of Dr. Dasika, Treating Neurologist

Neurologist Vijaya Dasika, M.D., treated and examined Plaintiff on two occasions during the period between July 15, 2001, the alleged onset date, and December 31, 2006, the date last insured. (A.R. at 164-69) In the treatment report prepared in connection with Plaintiff's July 16, 2001 visit to his office, Dr. Dasika noted pain and tenderness and observed a decreased range of motion in both the left shoulder and the cervical spine. (A.R. at 167-68) Dr. Dasika diagnosed aggravation of pre-existing cervical sprain and left shoulder derangement. (A.R. at 168).

In the August 17, 2001 report, Dr. Dasika noted Plaintiff's "marked inability to give good strength in the left upper extremity proximally because of her neck and left shoulder pains," "decreased pin sensation" over the left upper arm and in certain left fingers, and "depressed left brachial radialis and biceps reflexes." (A.R. at 164) Decreased range of motion and tenderness were also observed in both the cervical spine and the left shoulder during the August 17, 2001 visit. (A.R. at 164-65) Based on the foregoing, Dr. Dasika diagnosed unimproved cervical sprain and left shoulder derangement. (A.R. at 165)

### d. Medical Opinion of Dr. Mazella, Workers' Compensation Board Consulting Orthopedic Surgeon

Dr. John Mazella, a consulting orthopedic surgeon, examined Plaintiff on three separate occasions for purposes of evaluating and reporting on Plaintiff's medical status as it related to

her Workers' Compensation claim. (A.R. at 153-55 (February 8, 2002 report)[8]; A.R. at 148-51 (October 16, 2002 report)) Dr. Mazella noted strong positive impingement, a limited range of motion, and weakness in the left shoulder. (A.R. at 149, 150, 155) Based on these observations, he made the diagnosis of "status post-surgery times two with continued impingement, left shoulder."[9] (A.R. at 150)

### e.  Medical Opinion of Dr. Seo, SSA Consultative Examiner

On November 20, 2002, Kyung Seo, M.D., an SSA consultative examiner with a specialty in orthopedics, performed a physical examination of Plaintiff. (A.R. at 228-29) Dr. Seo diagnosed "internal derangement of the left shoulder, status post multiple arthroscopic procedure[s] for the subacromial impingement syndrome" and "arthralgia of the left shoulder." (A.R. at 229) He noted moderate limitations in lifting and carrying heavy objects due to pain[10] and limited range of motion in and of the left shoulder but identified no abnormalities in the cervical spine based on a limited visualization of the C7 disc. (A.R. at 229)

### f.  Related ER Visits

During the period between July 15, 2001, the alleged onset date, and December 31, 2006, the date last insured, Plaintiff made four visits to three hospital emergency rooms to address her left shoulder and neck impairments. (A.R. at 203-08 (July 15, 2001 visit to Long Island College Hospital ER), A.R. at 173-74 (July 8, 2004 visit to Wyckoff Heights Medical Center ER), A.R. at 648-51 (July 18, 2005 visit to Jamaica Hospital Medical Center ER), A.R. at 652-54 (August

---

[8] The September 12, 2001 evaluation report is not found in the record, but the February 8, 2002 report contains a description of the September 12, 2001 report. (A.R. at 155)

[9] There is no indication in the record that Dr. Mazella examined the neck and/or the cervical spine.

[10] No weight limit or range was specified.

14, 2005 visit to Jamaica Hospital Medical Center ER)) The July 15, 2001 triage assessment report prepared by Long Island College Hospital indicates the diagnosis of left rotator cuff tear. (A.R. at 205, 207-08) Medical records from Wyckoff Heights Medical Center note that Plaintiff made a visit to the ER on July 8, 2004 due to an impaired range of motion in the neck and cervical strain. (A.R. at 273-75) Plaintiff also paid two visits to the ER at Jamaica Hospital Medical Center on July 18, 2005 and August 14, 2005, respectively, for purposes of obtaining treatment for neck and shoulder pain and apparently related tingling throughout the left side of her body. (A.R. at 648-54) A diagnosis of cervical radiculopathy was made at the July 18, 2005 visit. (A.R. at 651)

### g. Medical Opinion of Dr. Greenberg, SSA Non-Examining Physician

Dr. Gerald Greenberg, an internist and a non-examining medical expert engaged by the SSA, testified at the June 26, 2008 hearing before the ALJ solely based on his review of Plaintiff's medical records. He confirmed that Plaintiff had significantly reduced range of motion in her left arm and pain in her left shoulder. (A.R. at 1041) However, he misread the record as indicating that Plaintiff had no limitations in sitting, standing or walking and no significant postural or manipulative limitations. (A.R. at 1038) Dr. Greenberg opined that Plaintiff had the ability to lift or carry objects weighing up to five pounds and possessed the residual functional capacity for sedentary work. (A.R. at 1037, 1040)

### 3. Asthma

#### a. Diagnostic Test Results

The record contains reports for two spirometry tests performed to assess Plaintiff's pulmonary function. (A.R. at 583, 625 (repeat), 672, 675 (repeat)) *See Daniel v. Astrue*, 2011

---

WL 5922887, *13 (S.D.N.Y. Nov. 28, 2011) (indicating that a spirometry test is a pulmonary function test that may be used to determine the severity of a social security claimant's asthma). The December 17, 2003 report contains the following interpretations: "PREMED: Testing indicates mild restriction. POSTMED: Testing indicates severe restriction." (A.R. at 583) The August 24, 2004 report states: "PREMED: Testing indicates severe restriction. POSTMED: Testing indicates severe restriction." (A.R. at 578) A radiological examination performed on April 7, 2003 and x-ray examinations performed on August 24, 2004 and September 3, 2006 revealed no abnormalities in the chest. (A.R. at 428, 521-A)

**b.    Medical Opinions of Drs. Kessler and Mani, Treating Physicians**

Between December 17, 2003 and November 15, 2005, Plaintiff made ten visits to Phoenix Medical Center. (A.R. at 513-20, 566, 567-75, 606-15) Dr. Mathew Mani examined Plaintiff on December 17, 2003 and February 4, 2004 and diagnosed asthma. (A.R. at 513-14, 574-75 (repeat)) Dr. David Kessler treated Plaintiff's asthma and related symptoms during the remaining eight visits, beginning on May 13, 2004 and ending on November 15, 2005.[11] (A.R. at 515-20, 567-70, 572-75, 606-10, 612-15)[12]

In a multiple impairment questionnaire completed by Dr. Kessler on November 15, 2005, the doctor included asthma as a diagnosis.[13] (A.R. at 538-43, 547-48) When asked to identify

---

[11] The portion of the treatment notes handwritten by Dr. Kessler is illegible for the most part.

[12] The reported history of asthma is consistent with a notation made by Dr. Gray in an operative report that Plaintiff suffered an asthmatic attack during the October 19, 2000 shoulder surgery. (A.R. at 210)

[13] Dr. Kessler also included "possible sleep apnea" as a diagnosis, but there is no indication in the record that he treated Plaintiff for sleep apnea. (A.R. at 538) In fact, a February 4, 2004 study of Plaintiff's sinus rhythm indicated that it fell within normal limits. (A.R. at 582)

any laboratory or diagnostic test results that demonstrated or supported this diagnosis, he stated "abnormal pulmonary function test". (A.R. at 539) Given that the only pulmonary function tests found in the administrative record are the spirometry tests performed on December 17, 2003 and August 24, 2004, respectively, the reference to the pulmonary function test appears to be a reference to one of the two tests. Dr. Kessler also noted fatigue and shortness of breath consistent with Plaintiff's physical impairments. (A.R. at 539-40) He opined that Plaintiff had the capability to sit for four hours and stand/walk for two hours during an eight-hour workday but needed to "get up and move around" every thirty minutes.[14] (A.R. at 540-41) Dr. Kessler additionally noted that Plaintiff needed to avoid fumes, gases and dust in a work setting and was incapable of enduring even a low level of work stress. (A.R. at 543, 547)

### c. Hospitalization and ER Visits

Plaintiff was hospitalized at Wyckoff Heights Medical Center from June 7, 2004 to June 11, 2004 for acute asthma exacerbation. (A.R. at 285-320) On September 29, 2004, she made a visit to the emergency room at Wyckoff Heights Medical Center due to chest tightness. (A.R. at 280) A clinical impression of asthma exacerbation and bronchitis was noted at the time. (A.R. at 284) On February 22, 2006, Plaintiff visited the emergency room at Jamaica Hospital Medical

---

Further, Plaintiff did not begin to obtain treatment for sleep apnea and arrange for documentation of the condition until July 18, 2007, which is after December 31, 2006, the date last insured. (A.R. at 992-99 (multiple impairment questionnaire completed by Dr. Sergio Martinez, Plaintiff's treating pulmonologist), 992 (listing the initial treatment date as July 18, 2007)) Therefore, Plaintiff may not claim eligibility for disability insurance benefits based on sleep apnea, a condition that was not established until after the date last insured. *See* 42 U.S.C. 423(a)(1) (stating that an individual must be both disabled and insured for disability insurance benefits in order to qualify for such benefits).

[14] Dr. Kessler indicated that Plaintiff was capable of occasionally carrying or lifting objects weighing up to five pounds. (A.R. at 541) He also opined that Plaintiff was significantly limited in the use of her left arm and hand. (A.R. at 541-42) However, there is no indication in the record that Dr. Kessler ever treated or examined Plaintiff for impairments other than asthma.

12

Center, again due to asthma exacerbation and related wheezing. (A.R. at 657-61)

### d. Medical Opinion Dr. Greenberg, SSA Non-Examining Physician

Dr. Greenberg, who testified at the June 26, 2008 hearing before the ALJ on Plaintiff's left shoulder impairment, also provided testimony at the same hearing regarding Plaintiff's asthma. He stated that Plaintiff's asthma was "significant" and opined that she should not be exposed to respiratory allergens in a work setting and therefore needed to work in an indoor environment. (A.R. at 1038-39) However, contrary to Dr. Kessler's apparent reliance on the results of at least one of the pulmonary function studies, Dr. Greenberg stated that the related pulmonary function studies set forth in the record were unreliable and uninterpretable. (A.R. at 1030-31, 1038-39, 1043)

### 4. Psychiatric Impairment

#### a. Psychiatric Treatment at Jamaica Hospital Medical Center

Plaintiff received extensive treatment for her psychiatric impairment at Jamaica Hospital Medical Center from June 2003 to December 2006 during the period between July 15, 2001, the alleged onset date, and December 31, 2006, the date last insured. (A.R. at 343-413, 734-858) During this time, Plaintiff received individual psychotherapy from Ms. Diane Capezza, a licensed clinical social worker and psychotherapist, generally on a weekly basis, and medication management reviews from Teresita Ruiz, M.D., a psychiatrist, generally on a monthly basis. (A.R. at 363, 529) Plaintiff also attended weekly group psychotherapy sessions conducted mostly by Ms. Capezza. (A.R. at 433-511, 888-976)

At the initial psychiatric evaluation performed on June 6, 2003 by Dr. Ruiz, the treating psychiatrist, Plaintiff was diagnosed under the DSM-IV multi-axial evaluation system with

"major depression, single episode, PTSD" on Axis I. (A.R. at 345) Dr. Ruiz deferred her diagnosis on Axis II, listed shoulder dislocation as her diagnosis on Axis III, and opined in connection with Axis IV that Plaintiff suffered psychosocial stressors of moderate severity in the form of accidents, job loss and related financial factors. (A.R. at 345) On Axis V, Dr. Ruiz noted "fair" as the highest level of adaptive functioning in the past year. (A.R. at 345).

On May 7, 2003, Ms. Capezza, the clinical social worker and psychotherapist, conducted an initial diagnostic interview of Plaintiff. (A.R. at 370, 714-17) Ms. Capezza noted that Plaintiff had been experiencing difficulties sleeping, was "fearful of everything" and had "thoughts of suicide" but no plan. (A.R. at 370, 715). Psychiatric symptoms reportedly "have been present for years" and were exacerbated by the 1999 bus accident. (A.R. at 370) The symptoms appear to be related to the fact that Plaintiff had been raped twice in the past, once by her father while still a child and once by a co-worker. (A.R. at 715) Furthermore, Plaintiff's mother left her father when Plaintiff was ten-years old "due to sexual abuse." (A.R. at 716). Plaintiff had had no contact with her father "for the past 30 years." (A.R. at 716).

Ms. Capezza treated Plaintiff from June 2003 to December 2006 during 75 individual psychotherapy sessions. (A.R. at 373 (June 23, 2003 and June 30, 2003 treatment notes), A.R. at 374 (July 8, 2003 and July 22, 2003 treatment notes), A.R. at 376 (July 28, 2003 and August 11, 2003 treatment notes), A.R. at 379 (September 10, 2003 and September 22, 2003 treatment notes), A.R. at 380 (September 29, 2003 treatment notes), A.R. at 381 (October 13, 2003 treatment notes), A.R. at 382 (October 27, 2003 treatment notes), A.R. at 384 (November 10, 2003 and November 17, 2003 treatment notes), A.R. at 385 (November 18, 2003 and December 8, 2003 treatment notes), A.R. at 386 (December 15, 2003), A.R. at 390 (January 20, 2004 and January 26, 2004 treatment notes), A.R. at 831 (repeat), A.R. at 391 (February 9, 2004 treatment

notes), A.R. at 832 (repeat), A.R. at 393 (March 22, 2004 treatment notes), A.R. at 394 (March 29, 2004 treatment notes), A.R. at 835 (repeat), A.R. at 395 (April 2, 2004 treatment notes), A.R. at 836 (repeat), A.R. at 396 (April 7, 2004 treatment notes), A.R. at 397 (April 12, 2004 treatment notes), A.R. at 838 (repeat), A.R. at 398 (April 26, 2004 treatment notes), A.R. at 399 (May 3, 2004 treatment notes), A.R. at 400 (May 10, 2004 treatment notes), A.R. at 401 (May 24, 2004 treatment notes), A.R. at 402 (June 3, 2004 treatment notes), A.R. at 403 (June 21, 2004 treatment notes), A.R. at 404 (July 12, 2004 treatment notes), A.R. at 405 (July 19, 2004 treatment notes), A.R. at 406 (July 26, 2004 treatment notes), A.R. at 408 (September 27, 2004 and October 4, 2004 treatment notes), A.R. at 409 (October 18, 2004 treatment notes), A.R. at 413 (January 28, 2005 treatment notes), A.R. at 856 (April 18, 2005 treatment notes), A.R. at 857 (May 23, 2005 treatment notes), A.R. at 858 (June 6, 2005 treatment notes), A.R. at 859 (June 20, 2005 treatment notes), A.R. at 860 (July 11, 2005 treatment notes), A.R. at 860 (August 1, 2005 treatment notes), A.R. at 861 (August 15, 2005 treatment notes), A.R. at 862 (August 29, 2005 treatment notes), A.R. at 863 (September 12, 2005 treatment notes), A.R. at 864 (September 19, 2005 treatment notes), A.R. at 865 (October 3, 2005 treatment notes), A.R. at 865 (October 10, 2005 treatment notes), A.R. at 865-66 (November 7, 2005 treatment notes), A.R. at 759 (November 14, 2005 treatment notes), A.R. at 759 (December 5, 2005 treatment notes), A.R. at 760 (December 12, 2005 and January 9, 2006 treatment notes), A.R. at 760-61 (January 30, 2006 treatment notes), A.R. at 762 (February 27, 2006 treatment notes), A.R. at 763 (March 6, 2006 and March 13, 2006 treatment notes), A.R. at 764 (April 3, 2006 treatment notes), A.R. at 765 (May 1, 2006 and May 8, 2006 treatment notes), A.R. at 768 (May 22, 2006 and June 5, 2006 treatment notes), A.R. at 768 (July 3, 2006 treatment notes), A.R. at 769 (July 10, 2006 treatment notes), A.R. at 770 (July 17, 2006 treatment notes), A.R. at 771 (August 2,

2006 and August 14, 2006 treatment notes), A.R. at 772 (September 11, 2006 treatment notes),

A.R. at 773 (September 25, 2006 treatment notes), A.R. at 774 (October 16, 2006 treatment

notes), A.R. at 775 (November 13, 2006 treatment notes), A.R. at 776 (December 4, 2006

treatment notes), A.R. at 776 (December 11, 2006 treatment notes), A.R. at 777 (December 18,

2006 treatment notes))

Plaintiff frequently reported feeling depressed and/or appeared tearful at the individual

psychotherapy sessions with Ms. Capezza throughout the relevant period of treatment. (A.R. at

373-74, 376, 379, 385, 390, 401, 408, 760-61, 763, 765, 772, 777, 860, 862, 863, 885) On four

occasions, Plaintiff reported panic attacks in the immediate past. (A.R. at 397, 773, 856, 865-66)

From September 30, 2003 to December 6, 2006, Plaintiff also attended group

psychotherapy sessions conducted mostly by psychotherapist Ms. Capezza. (A.R. at 433-511,

807-20, 888, 890, 892) At most sessions, Plaintiff was verbally and emotionally expressive and

demonstrated the ability to empathize with other group members. *See id.* However, Plaintiff

exhibited anxiety and discomfort at sessions attended by relatively large groups of people and/or

by strangers. (A.R. at 441-42, 459-60, 511)

Dr. Ruiz, the treating psychiatrist, performed twenty-seven medication management

reviews, generally on a monthly basis, in order to assess the effects of psychotropic medications

prescribed to Plaintiff and to evaluate Plaintiff's condition and progress. (A.R. at 371 (June 12,

2003 review), A.R. at 375 (July 24, 2003 review), A.R. at 378 (August 27, 2003 review), A.R. at

381 (October 8, 2003 review), A.R. at 383 (November 7, 2003 review), A.R. at 387 (December

22, 2003 review), A.R. at 394 (March 24, 2004 review), A.R. at 399 (April 28, 2004 review),

A.R. at 402 (May 26, 2004 review), A.R. at 842 (repeat), A.R. at 405 (August 4, 2004 review),

A.R. at 410 (November 17, 2004 review), A.R. at 412 (December 16, 2004 review), A.R. at 853

(repeat), A.R. at 740-41 (March 6, 2005 review), A.R. at 742-43 (June 6, 2005 review), A.R. at 861 (August 1, 2005 review), A.R. at 862 (September 7, 2005 review), A.R. at 864 (October 5, 2005 review), A.R. at 866 (November 16, 2005 review), A.R. at 761 (February 8, 2006 review), A.R. at 762 (March 8, 2006 review), A.R. at 764 (April 21, 2006 review), A.R. at 767 (May 10, 2006 review), A.R. at 767 (June 7, 2006 review), A.R. at 769 (July 5, 2006 review), A.R. at 771 (August 30, 2006 review), A.R. at 773-74 (October 11, 2006 review), A.R. at 776 (December 6, 2006 review))

Dr. Ruiz observed depressed mood in the Plaintiff throughout the period of treatment. (A.R. at 378, 381, 405, 410, 413, 767, 769, 862, 864, 885) Psychosis and suicidal/homicidal ideations, however, were consistently absent. (A.R. at 378, 381, 383, 394, 402, 405, 412, 761, 767, 769, 856, 857, 864)

Dr. Ruiz and Ms. Capezza completed fourteen quarterly joint treatment plan reviews on Plaintiff's behalf. (A.R. at 359-64 (September 6, 2003 review), A.R. at 364A-65 (December 6, 2003 review), A.R. at 728-31 (repeat), A.R. at 366-67 (March 6, 2004 review), A.R. at 368-69 (June 6, 2004 review), A.R. at 736-37 (September 6, 2004 review), A.R. at 738-39 (December 6, 2004 review), A.R. at 740-41 (March 6, 2005 review), A.R. at 742-43 (June 6, 2005 review), A.R. at 743A-744 (September 6, 2005 review), A.R. at 745-46 (December 6, 2005 review), A.R. at 747-48 (March 6, 2006 review), A.R. at 749-50 (June 6, 2006 review), A.R. at 751-52 (September 6, 2006 review), A.R. at 753-54 (December 6, 2006 review)) It was noted in the joint reviews that a major goal of treatment was reduction of Plaintiff's depression. (*See, e.g.,* A.R. at 365, 367, 737, 739, 741) Plaintiff remained depressed and anxious, however, towards the end of the relevant treatment period. (A.R. at 742-43, 743A-44, 747-48, 749-50, 753-54)

On September 17, 2005, Dr. Ruiz, the treating psychiatrist, completed a

psychiatric/psychological impairment questionnaire on Plaintiff's behalf. (A.R. at 529-36)

Based on the DSM-IV multi-axial evaluation system, Dr. Ruiz diagnosed "major depression disorder, recurrent" for Axis I, deferred for Axis II, asthma and left shoulder injury with two surgeries for Axis III, and unemployment and financial problems for Axis IV. (A.R. at 529) She assigned a Global Assessment Functioning[15] score of 55 for Axis V, which reflects moderate symptoms or difficulty in social or occupational functioning. (A.R. at 529) *See Perez-Rodriguez v. Astrue*, 2011 WL 6413763 (S.D.N.Y. Dec. 21, 2011), *3 (stating that a Global Assessment Functioning score of 55 "reflects moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or coworkers)") (internal quotation marks omitted); *see also Petrie v. Astrue*, 412 Fed.Appx. 401, 406 n.2 (2d Cir. 2011).

Dr. Ruiz made the following clinical findings: sleep disturbance, mood disturbance, emotional lability, feelings of guilt or worthlessness, difficulty thinking or concentrating, hostility and irritability, decreased energy, and social withdrawal or isolation. (A.R. at 530) The doctor noted marked limitations in Plaintiff's ability to maintain attention and concentration for extended periods of time and moderate limitations in other aspects of the functional area denoted "sustained concentration and persistence." (A.R. at 532) In the functional area denoted "understanding and memory," Dr. Ruiz assessed that Plaintiff suffered from mild limitations in her ability to understand and remember one- or two-step instructions and moderate limitations in her ability (1) to remember locations and work-like procedures and (2) to understand and

---

[15] "GAF is a scale that indicates the clinicians' overall opinion of an individual's psychological, social, and occupational functioning." *Petrie v. Astrue*, 412 Fed.Appx. 401, 406 n.2 (2d Cir. 2011) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 376-77 (4th ed., text revision, 2000)). "The GAF scale ranges from 0 to 100 . . . ." *Id.*

remember detailed instructions. (A.R. at 532) Dr. Ruiz noted moderate limitations in all aspects of the last two listed functional areas: "social interactions" and "adaptation". (A.R. at 533-34)

Dr. Ruiz made the assessment that Plaintiff would experience episodes of deterioration or decompensation in work or work-like settings, which would cause her to withdraw from the situation and/or experience exacerbation of symptoms. (A.R. at 534) She also noted that Plaintiff is not a malingerer. (A.R. at 535) Based upon the foregoing assessment, Dr. Ruiz opined that Plaintiff was capable of enduring only a low level of work stress. (A.R. at 535)

**b. Medical Opinion of Dr. Kessel, Consultative Examiner**

On February 21, 2003, Jerome Kessel, M.D., a consultative examiner for the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations, performed a one-time examination of Plaintiff and provided a written evaluation of Plaintiff's mental residual functional capacity. (A.R. at 235-52) Dr. Kessel opined that Plaintiff had moderate limitations in some aspects of work-related social interaction, including the ability to accept instructions and respond appropriately to criticisms from supervisors, the ability to get along with coworkers without distracting them, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (A.R. at 236) The consultative examiner also found moderate limitations in Plaintiff's ability to adapt to work-related changes, including the ability to respond appropriately to changes in the work setting, the ability to travel to unfamiliar places or use public transportation and the ability to set realistic goals or make plans independently. (A.R. at 236)

Dr. Kessel described Plaintiff as malodorous, tearful, and exhibiting poor eye contact during the examination, but he did not find her to be "actively psychotic or suicidal". (A.R. at

237) The doctor noted that Plaintiff's mood was anxious and depressed. (A.R. at 237) Mood disturbance was evidenced by depressive syndrome characterized by (1) anhedonia, (2) sleep disturbance, (3) psychomotor agitation or retardation, (4) decreased energy, (5) feelings of guilt or worthlessness, and (6) hallucinations, delusions or paranoid thinking. (A.R. at 242) In the four functional areas specified in 20 C.F.R. § 404.1520a(c)(3) for purposes of evaluating mental impairments, Dr. Kessel found (1) a moderate level of restriction in activities of daily living, (2) moderate difficulties in maintaining social functioning, (3) mild difficulties in maintaining concentration, persistence, or pace and (4) no extended episodes of decompensation. (A.R. at 249) He diagnosed major depression. (A.R. at 237)

c.   **Medical Opinion of Dr. Algaze, SSA Consultative Examiner**

On November 19, 2002, Joshua Algaze, M.D., an SSA consultative examiner, performed a mental status examination of Plaintiff. (A.R. at 226-27) Dr. Algaze noted that Plaintiff "appeared anxious, tense" and was "tearful" during the examination. (A.R. at 227) Additionally, Plaintiff exhibited "mild psychomotor retardation" and "poor eye contact" at such time. (A.R. at 227) Dr. Algaze opined that Plaintiff suffered "from moderate difficulties in personal, social and occupational adjustment that impair[ed] her ability to tolerate work pressures." (A.R. at 227) He further opined that Plaintiff had an "unsatisfactory ability to respond appropriately to supervision, co-workers and work pressures in a work setting because of her persistent paranoid ideations, and ideas of reference." (A.R. at 227) The doctor found Plaintiff's allegations of depression to be "consistent with [his] findings." (A.R. at 227) Dr. Algaze diagnosed major depression with psychotic features on Axis I, "[p]ersonality disorder NOS" on Axis II and deferred his diagnosis on Axis III. (A.R. at 227)

**d. Medical Opinion of Dr. Jonas, SSA Non-Examining Psychiatrist**

Dr. Alfred Jonas, a non-examining psychiatrist engaged by the SSA, testified telephonically at the June 26, 2008 supplemental hearing before the ALJ regarding Plaintiff's mental impairments based solely on his review of the administrative record. (A.R. at 1044-76) Contrary to the medical opinions and diagnoses of Plaintiff's treating psychiatrist, the State Agency and SSA consultative medical examiners and Plaintiff's psychotherapist, Dr. Jonas stated that the diagnosis of depression could not be confirmed due to Plaintiff's amplification and exaggeration of her symptoms and emotions. (A.R. at 1054 ("I think that generally speaking the mental health aspect of this record is comparatively amplified with sort of an over-portrayal of emotional issues."), 1055, 1060, 1067). Dr. Jonas instead found "some support for the concept of a Personality Disorder" despite the fact that the diagnosis had been deferred by Dr. Ruiz, the treating psychiatrist. (A.R. at 1054, 1058) He explained at the hearing that the record indicated "some sort of mild distortion in interpersonal relating" and mood instability, which findings would tend to support a diagnosis of personality disorder. (A.R. at 1060-61)

Dr. Jonas opined that Plaintiff possessed a moderate impairment in the maintenance of appropriate social functioning and a minor impairment in concentration, persistence and pace. (A.R. at 1062-63) Dr. Jonas noted in particular that Plaintiff would experience difficulties in her dealings with the broad, general public, especially in situations where a high degree of interaction is required. (A.R. at 1064) In his opinion, Plaintiff would not work well with a large group of co-workers. (A.R. at 1064)

Dr. Jonas explicitly disagreed with the diagnosis rendered by Dr. Ruiz, the treating psychiatrist, based on his observation that the treatment prescribed by Dr. Ruiz was modest in

light of the severity of her diagnoses.[16] (A.R. at 1069-70, 1073) Dr. Jonas reasoned that the

inexplicably light doze of antidepressant prescribed by Dr. Ruiz over a prolonged period of time

was an indication that even Dr. Ruiz herself "disagrees with herself in the difference between her

diagnosis and her treatment-related behavior." (A.R. at 1070)


## II.    DISCUSSION

### A.    **Standard of Review**

In reviewing the ALJ's decision, "it is not [this Court's] function to determine *de novo*

whether plaintiff is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (internal

quotation marks and citation omitted). "Rather, [this Court] must determine whether the

Commissioner's conclusions are supported by substantial evidence in the record as a whole or

are based on an erroneous legal standard." *Id.* (internal quotation marks and citation omitted);

*accord Jordan v. Comm'r of Social Security*, 194 Fed. Appx. 59, 61, 2006 WL 2564382 (2d Cir.

Sept. 1, 2006) ("We review the agency's final decision to determine, first, whether the correct

legal standards were applied and, second, whether substantial evidence supports the decision.")

(internal citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence has been defined as

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Schaal*, 134 F.3d at 501 (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427,

28 L.Ed.2d 842 (1971)) (internal quotation marks omitted); *accord Veino v. Barnhart*, 312 F.3d

578, 586 (2d Cir. 2002). "To determine whether the [ALJ's] findings are supported by

---

[16] During his testimony, Dr. Jonas repeatedly used the masculine singular pronoun "he" when referring to Dr. Teresita Ruiz until he was corrected. (A.R. at 1069-70) This fact would tend to suggest that Dr. Jonas failed to thoroughly review relevant portions of the administrative record, as the record is replete with references to and treatment notes prepared by Dr. Ruiz.

substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999) (internal quotations marks and citation omitted). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996); *see also Latham v. Comm'r of Soc. Sec.*, 2009 WL 1605414 at *8 (N.D.N.Y. Jun. 5, 2009) (citing 42 U.S.C. § 405(g)) (other citation omitted).

### B.    Analysis for Disability Determinations

The Social Security regulations "establish a five-step process" pursuant to which "the Commissioner is required to evaluate a claim for disability benefits." *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002); *accord* 20 C.F.R. § 404.1520 (codifying the five-step analytical framework). The process is one of sequential evaluation, such that if the Commissioner is able to make a specified conclusive determination regarding the claimant's disability at a given step, there is no need to perform the analysis set forth under the next successive step. *See* 20 C.F.R. § 404.1520(4).

At step one, a claimant's work activity is considered. *See* 20 C.F.R. § 404.1520(4)(i). A finding of "not disabled" is warranted if the claimant is engaged in substantial gainful activity. *See id*; *accord Draegert*, 311 F.3d at 472. If the claimant is not engaged in substantial gainful activity, the analysis proceeds to step two, at which the medical severity of the claimant's impairments is evaluated. *See* 20 C.F.R. § 404.1520(4)(ii); *accord DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998). If the claimant is found to suffer from a severe impairment or combination of impairments that is severe, the third step of the inquiry is performed to determine

whether the claimant has an impairment or impairments that meet or equal the criteria listed in Appendix 1 to Subpart P of Part 404, Title 20 of the Code of Federal Regulations. *See* 20 C.F.R. § 404.1520(4)(iii); *DeChirico*, 134 F.3d at 1179-80. A finding of "disabled" must be made if all criteria for a listed impairment are met. *See id.* If the claimant's impairment or impairments cannot be equated with at least one of the impairments listed in Appendix 1, the analysis continues.

Before step four is performed, however, an assessment of the claimant's residual functional capacity is made. *See* 20 C.F.R. § 404.1520(4). This assessment is then used at both steps four and five. *See id.* At step four of the analysis, the claimant's ability to perform her past relevant work is evaluated; if the claimant is found to possess the residual functional capacity to perform such work, she is deemed "not disabled." *See* 20 C.F.R. § 404.1520(4)(iv); *DeChirico*, 134 F.3d at 1180.

Otherwise, the analysis proceeds to the fifth and last step, at which the Commissioner "consider[s] [her] assessment of [the claimant's] residual functional capacity and [the claimant's] age, education, and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 404.1520(4)(v); *accord* 20 C.F.R. § 404.1560(c)(1); *DeChirico*, 134 F.3d at 1180. At this final step of the analysis, "the ALJ is required to consult with a vocational expert" if "a claimant has nonexertional limitations that significantly limit the range of work permitted by his exertional limitations." *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)); *accord Bapp*, 802 F.2d at 605; *Pratts*, 94 F.3d at 39. If the claimant is found to possess the residual functional capacity to perform other work that exists in significant numbers in the national economy, a finding of "not disabled" is made; otherwise, a finding of "disabled" is made. *See* 20 C.F.R. § 404.1560(c); *see also* 20 C.F.R. §

404.1520(4)(v). "The claimant bears the burden of proof as to the first four steps, while the Commissioner must prove the final one." *DeChirico*, 134 F.3d at 1180 (internal citation omitted); *accord* 20 C.F.R. § 404.1560(c)(2) ("In order to support a finding that you are not disabled at [the] fifth step of the sequential evaluation process, we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors.")

### C.    'Special Technique' Evaluation of Mental Impairments

In addition to the five-step analytical framework outlined in 20 C.F.R. § 404.1520, "the Commissioner has promulgated additional regulations governing evaluations of the severity of mental impairments." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citing 20 C.F.R. § 404.1520a); *see also* 20 C.F.R. § 404.1520a. The additional regulations "require application of a 'special technique' at the second and third steps of the five-step framework . . . and at each level of administrative review." *Id.* at 265 (citing 20 C.F.R. § 404.1520a(a)) (other citation omitted); *see also Petrie*, 412 Fed.Appx. at 408 (discussing the application of the special technique) (citing *Kohler*, 546 F.3d at 265-66; 20 C.F.R. §§ 404.1520a(a), 416.920a(a)).

First, "this technique requires the reviewing authority to determine . . . whether the claimant has a 'medically determinable mental impairment.'" *Kohler*, 546 F.3d at 265-66 (quoting 20 C.F.R. § 404.1520a(b)(1)). If it has been determined that the claimant suffers from such an impairment, "the reviewing authority must rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) [of 20 C.F.R. § 404.1520a]." *Id.* at 266 (citing 20 C.F.R. § 404.1520a(b)(2)). The four broad functional areas in which ratings are required to be given consist of: "(1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensastion." *Id.* (citing 20 C.F.R. §

404.1520a(c)(3)); *see also Petrie*, 412 Fed.Appx. at 408.[17] "If [the reviewing authority] rate[s] the degree of [the claimant's] limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area," a conclusion will be drawn that the claimant's impairment is not severe "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).

"If the claimant's mental impairment is severe, the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder." *Kohler*, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(2)). If the impairment is not equivalent to any listed mental disorder, "the reviewing authority will then assess the claimant's residual functional capacity." *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)). The ALJ's written decision must reflect application of the special technique provided under 20 C.F.R. § 404.1520a. *See id.* Specifically, the decision "must incorporate the pertinent findings and conclusions based on the technique" and "must include a specific finding as to the degree of limitation in each of the [four] functional areas described in paragraph (c) of this section." 20 C.F.R. § 404.1520a(e)(4).

## D.    Final Decision of ALJ

The ALJ issued a decision on October 28, 2008 denying Plaintiff's application for disability benefits following the supplemental hearing held before her on June 26, 2008. (A.R. at

---

[17] Episodes of decompensation are defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining concentration, persistence, or pace." *Kohler*, 546 F.3d at 266 n.5 (citing United States Social Security Administration, Disability Evaluation Under Social Security § 12.00 (June 2006) *available at* http://www.ssa.gov/disability/professionals/bluebook 12.00- Mental Disorders- Adult.htm).

28-38.) Applying the five-step sequential evaluation process mandated by 20 C.F.R. § 404.1520, the ALJ found at step one that "the claimant did not engage in substantial gainful activity during the period from her alleged onset date of July 15, 2001 through her date last insured of December 31, 2006." (A.R. at 31) Proceeding to step two, the ALJ concluded that "[t]hrough the date last insured, the claimant had the following severe impairments: left upper extremity impingement, status post surgeries, asthma and personality disorder." (A.R. at 31) However, the ALJ found "no medically determinable neck impairment during the period at issue." (A.R. at 31)

In assessing the severity of Plaintiff's mental impairment, the ALJ rated the degree of functional limitation resulting from the impairment in four broad functional areas, as required by 20 C.F.R. § 404.1520a(c). First, in activities of daily living, the ALJ determined that Plaintiff "had mild restriction[s]." (A.R. at 32) Second, in social functioning, the ALJ found "moderate difficulties." (A.R. at 32) Third, with regard to concentration, persistence or pace, the ALJ determined that Plaintiff "had no difficulties." (A.R. at 32) Fourth, the ALJ noted the absence of any episodes of decompensation. (A.R. at 33) In making the foregoing findings in each of the four specified functional areas, the ALJ relied heavily upon the testimony of Dr. Jonas, the non-examining medical expert in psychiatry. (A.R. at 32-33)

At step three of the analysis, the ALJ made the finding that "the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (A.R. at 32)[18] Before proceeding to step four of the analysis, the ALJ found Plaintiff to "ha[ve] the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she was unable to lift more

---

[18] The ALJ determined that Plaintiff's mental impairment did not meet the criteria of, and was not equivalent in severity to, any of the mental disorders listed in Section 12.00 of the Listing of Impairments found at 20 C.F.R., Part 404, Subpart P, Appendix A. (A.R. at 33)

27

than five pounds with the left upper extremity." (A.R. at 33) Further, "she had to avoid working outdoors and avoid exposure to respiratory allergens." (A.R. at 33) In terms of psychiatric limitations, Plaintiff "had to avoid dealing with the broad general public, avoid a large degree of interaction with co-workers and avoid working with a large group of people." (A.R. at 33)

In making the findings relating to Plaintiff's physical impairments, the ALJ gave significant weight to the medical opinion of Dr. Greenberg, the non-examining medical expert who testified at the June 26, 2008 supplemental hearing regarding Plaintiff's physical impairments. (A.R. at 36) Significant weight was accorded to the opinion of Dr. Gray, the treating orthopedic surgeon, and Dr. Kessler, the treating pulmonologist, "*only to the extent* of [the] five pound[] [lifting/carrying] limitation of the left upper extremity," as "the assessment [was] consistent with the opinion of Dr. Greenberg." (A.R. at 36) (emphasis added).

Similarly, the ALJ assigned significant weight to Dr. Jonas' testimony that Plaintiff suffered from personality disorder as opposed to major depression. (A.R. at 35-36) In relying upon Dr. Jonas' opinion, the ALJ reasoned that "he is an expert in the field and his opinion is well explained." (A.R. at 36) The ALJ gave no weight to the medical opinion of Dr. Ruiz, the treating psychiatrist. (A.R. at 36). Further, the opinion of Ms. Capezza, the psychotherapist and clinical social worker who provided extensive treatment to Plaintiff, was not even mentioned or discussed in the ALJ's decision.

Proceeding to step four of the analysis, the ALJ found that "[t]hrough the date last insured, the claimant was unable to perform past relevant work" as a driver or bus driver, as it was classified as medium work. (A.R. at 36) Then, at step five, the ALJ noted that "the claimant's ability to perform all or substantially all of the requirements of [light] work was

impeded by additional limitations." (A.R. at 37) The ALJ relied upon the testimony of vocational expert Pat Green, who made an appearance at the June 26, 2008 supplemental hearing, in order to "determine the extent to which these limitations erode the unskilled light occupational base" and to determine "whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. (A.R. at 37, 1078-88)

The vocational expert testified that an individual with Plaintiff's profile would have the residual functional capacity "to perform the requirements of representative occupations such as pari-mutuel ticket checker . . ., assembler of small products . . ., and garment sorter." (A.R. at 37; *see also* A.R. at 1080-81)[19] Based upon the foregoing testimony, the ALJ concluded that "the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." (A.R. at 37) Thus, the ALJ found Plaintiff to be "not disabled" during the period between July 15, 2001, the alleged onset date, and December 31, 2006, the date last insured, and denied her application for disability insurance benefits. (A.R. at 37-38)

---

[19] Upon cross-examination by Plaintiff's attorney, however, the vocational expert admitted that Plaintiff would not be able to perform the work of a garment sorter or a small products assembler, because both types of work require the use of both hands. (A.R. at 1081-83) The vocational expert testified upon the subsequent request of the ALJ that Plaintiff would be able to perform the work of an addresser/stamper, a surveillance systems monitor and a telephone quotation clerk, in addition to that of a pari-mutuel ticket checker. (A.R. at 1086-88)

## III.    ANALYSIS

### A.    Weight Afforded Treating Physician's Medical Opinion

The Social Security regulations generally give significant weight to the medical opinion of a claimant's treating physician because a treating physician is "likely to be the . . . most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). If a treating physician's medical opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the administrative record]," such opinion must be given controlling weight. *Id*; *accord Snell*, 177 F.3d at 133.

When controlling weight is not given to a treating physician's opinion due to, for example, inconsistencies in the administrative record, a list of factors provided under 20 C.F.R. § 404.1527(d) must be considered for purposes of determining the weight to be given to the opinion. *See* 20 C.F.R. § 404.1527(d)(2). Among the factors set forth under 20 C.F.R. § 404.1527(d) are: (1) the length of the treatment relationship and the frequency of examination, *see* 20 C.F.R. § 404.1527(d)(2)(i); (2) the nature and extent of the treating relationship, including the amount of knowledge the physician has about the claimant's impairments as demonstrated by, *inter alia*, the physician's area of specialization, *see* 20 C.F.R. § 404.1527(d)(2)(ii); (3) the degree to which the opinion is supported by, *inter alia*, medical signs and laboratory findings, *see* 20 C.F.R. § 404.1527(d)(3); (4) the degree of consistency of the opinion with the record as a whole, *see* 20 C.F.R. § 404.1527(d)(4); (5) the specialization of the treating physician, such that more weight will be given "to the opinion of a specialist about medical issues related to his or

30

her area of specialty than to the opinion of a source who is not a specialist," 20 C.F.R. §

404.1527(d)(5); and (6) other factors brought to the attention of the SSA, 20 C.F.R. §

404.1527(d)(6), *see also Schaal*, 134 F.3d at 503 (enumerating the factors listed under 20 C.F.R.

§ 404.1527(d)).

### B.    Left Shoulder and Neck Impairments

Before an ALJ may elect to discredit the medical conclusions of a treating physician, she

must explicitly consider "(1) the frequency of examination and length, nature and extent of the

treatment relationship, (2) the evidence in support of the physician's opinion, (3) the consistency

of the opinion with the record as a whole, (4) whether the opinion is from a specialist, and (5)

whatever other factors tend to support or contradict the opinion." *Gunter v. Comm'r of Soc. Sec.*,

361 Fed.Appx. 197, 199 (2d Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)); *see also Brooks v.

Astrue*, 2012 WL 1802030, *6 (E.D.N.Y. May 17, 2012) (stating that "the ALJ must always give

good reasons in her decision for the weight accorded to a treating source's medical opinion.")

(citing *Clark v. Comm'r of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998)). The ALJ failed to

consider any of the above five factors or to "give good reasons" before she discredited the vast

majority of medical conclusions drawn by Dr. Gray. Thus, the ALJ failed to apply the treating

physician rule properly in her assessment of Plaintiff's left shoulder and neck impairments.

The ALJ committed an additional and related error in assigning significant weight to the

medical opinion of Dr. Greenberg, a consultative medical expert who never had the occasion to

examine or treat Plaintiff and relied solely upon the medical records found in the administrative

record in forming a diagnosis. *See Minsky v. Apfel*, 65 F.Supp.2d 124, 138 (2d Cir. 1999)

("[Medical] advisers' assessment of what other doctors find is hardly a basis for competent

evaluation without a personal examination of the claimant.") (quoting *Vargas v. Sullivan*, 898

F.2d 293, 295-96 (2d Cir. 1990)). The medical opinion of a non-examining medical expert does not constitute substantial evidence and may not be accorded significant weight. *See Pratts*, 94 F.3d at 38 (finding the testimony of a medical expert who "relied exclusively on the material in [the] record to form his opinion" to offer "no basis" for finding "substantial evidence necessary to uphold the ALJ's decision") (citing *Vargas*, 898 F.2d at 295-96, *Hidalgo v. Bowen*, 822 F.2d 294, 298 (2d Cir. 1987)); *see also id.* (stating that "a doctor's assessment of other doctor's findings merits little weight in a disability determination") (citing *Vargas*, 898 F.2d at 295-96).

Here, the non-examining medical expert did not appear to have a strong grasp of the administrative record, as evidenced by his mistaken pronouncement at the supplemental hearing that Plaintiff suffered from no limitations in sitting, standing or walking and no significant postural or manipulative limitations. The non-examining expert's statement directly contradicted the contents of the bilateral manual dexterity impairment questionnaire completed by the treating orthopedic surgeon, which indicated limitations in all of the areas named above. *Cf. Hidalgo*, 822 F.2d at 298 (noting the fact that the non-examining medical advisor did not have complete medical records of the claimant before him made the ALJ's improper reliance upon the advisor's testimony even more questionable).

The ALJ's commission of the foregoing errors alone would warrant a reversal and remand of the case to the Commissioner, because the ALJ has applied improper legal standards in determining the weights to be assigned to the medical opinion of the treating orthopedic surgeon and to the opinion of a non-examining medical expert. *See Pratts*, 94 F.3d at 39 (stating that remand has occurred "on numerous occasions" when "the ALJ has applied an improper legal standard") (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)); *Hankerson v. Harris*, 636 F.2d 893, 896 (2d Cir. 1980)); *see also Packer v. Apfel*, 1999 WL 14668, *5 (E.D.N.Y. Jan. 11,

1999) (remanding a case because "the ALJ did not observe the treating physician rule" and hence "made [his decision] according to an erroneous legal standard.").

C.    Asthma

Dr. David Kessler at Phoenix Medical Center examined and treated Plaintiff on eight occasions. The treating physician diagnosed asthma. Dr. Kessler further specified that Plaintiff was required to avoid exposure to fumes, gases and dust. The ALJ failed to "give good reasons" to support her decision not to accord any weight to the treating physician's opinion about Plaintiff's asthma or to explicitly consider the factors enumerated in 20 C.F.R. § 404.1527(d)(2) before discrediting the treating physician's medical conclusions. *See Brooks v. Astrue*, 2012 WL 1802030, *6 (E.D.N.Y. May 17, 2012) (stating that "the ALJ must always give good reasons in her decision for the weight accorded to a treating source's medical opinion.") (citing *Clark v. Comm'r of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998)); *accord* 20 C.F.R. § 404.1527(d); *see also Gunter*, 361 Fed.Appx. at 199.

The ALJ's improper application of the treating physician rule in analyzing Plaintiff's asthma condition provides an additional basis for reversing and remanding the case to the Commissioner. *See Pratts*, 94 F.3d at 39 (citing *Parker*, 626 F.2d at 235; *Hankerson*, 636 F.2d at 896); *see also Packer*, 1999 WL 14668, *5. Upon remand, the ALJ should also be mindful of the fact that a non-examining medical expert's opinion "merits little weight in a disability determination." *Pratts*, 94 F.3d at 38 (citing *Vargas*, 898 F.2d at 295-96); *see also Minsky*, 65 F.Supp.2d at 138. Despite the foregoing, the ALJ assigned significant weight to Dr. Greenberg's opinion regarding Plaintiff's asthma. As stated previously, Dr. Greenberg is a non-examining medical expert who relied solely on medical records obtained from other sources in forming his opinion.

33

### D. Mental Impairment

Dr. Ruiz, Plaintiff's treating psychiatrist, treated and examined Plaintiff on twenty-eight occasions from June 2003 to December 2006. During this period, Dr. Ruiz also completed a psychiatric/psychological impairment questionnaire and fourteen joint treatment plan reviews with Ms. Capezza, the psychotherapist and licensed clinical social worker. At the initial psychiatric evaluation performed on June 6, 2003, Dr. Ruiz diagnosed Plaintiff with "major depression, single episode, PTSD." (A.R. at 345) In the psychiatric/psychological impairment questionnaire completed on September 17, 2005, Dr. Ruiz listed "major depression disorder, recurrent" as her Axis I diagnosis. (A.R. at 529) The doctor additionally noted moderate symptoms or difficulty in social or occupational functioning, as represented by a Global Assessment Functioning score of 55.

"Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health." *Canales v. Comm'r of Soc. Sec.*, 698 F.Supp.2d 335, 342 (E.D.N.Y. 2010) (citing *Richardson v. Astrue*, 2009 WL 4793994, *7 (S.D.N.Y. Dec. 14, 2009)). Dr. Jonas, relying solely on his review of the administrative record, rejected Dr. Ruiz's diagnosis of major depression. He determined that Plaintiff suffered from personality disorder. The ALJ rejected Dr. Ruiz's opinion in favor of Dr. Jonas' opinion without giving any "good reasons" for doing so, as required under 20 C.F.R. § 404.1527(d). This was error. *See Bavaro v. Astrue*, 413 Fed. Appx. 382, 383-84 ("An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion.") (citing 20 C.F.R. § 404.1526(d)(2)); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam)) (internal quotation marks omitted).

The ALJ additionally assigned no weight to the medical opinion of Ms. Capezza, the psychotherapist and licensed clinical social worker, without offering any explanation. *See Canales*, 698 F.Supp.2d at 344 ("While the ALJ was free to conclude that the opinion of a licensed social worker was not entitled to any weight, the ALJ had to explain that decision.") Although not considered an acceptable medical source under the regulations, *see* 20 C.F.R. § 404.1513(a), clinical social workers are considered to be "other sources," as defined in 20 C.F.R. § 404.1513(d) and § 416.913(d), whose opinions may be used to "show the severity of [the claimant's] impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 23299399, *2 (Soc. Sec. Admin. Aug. 9, 2006). The SSA has recognized the growing importance of medical sources such as clinical social workers:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as . . . *licensed clinical social workers*, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 06-03p, 2006 WL 2329939, at *3 (emphasis added).

Ms. Capezza, a licensed clinical social worker and psychotherapist, treated Plaintiff's mental impairment a total of seventy-five times during the period from the alleged onset date to the date last insured. No other medical source examined or treated Plaintiff's mental impairment on a more extensive basis. The record is replete with treatment notes that document observations made by Ms. Capezza during the psychotherapy sessions, treatment plan reviews and evaluations prepared by Ms. Capezza.

In light of the extensive treatment rendered by Ms. Capezza, it is clear that Ms. Capezza has "assumed a great[] percentage of the treatment and evaluation functions previously handled

primarily by physicians and psychologists." SSR 06-03p, 2006 WL 2329939, at \*3. Given the SSA's pronouncement that opinions from licensed clinical social workers such as Ms. Capezza are important and should be evaluated along with other relevant evidence, the ALJ erred in omitting to explicitly consider Ms. Capezza's opinion regarding Plaintiff's mental impairment without explaining such omission. This unexplained omission constitutes failure to comply with the requirements of Social Security Ruling 06-03p. *See Canales*, 698 F.Supp.2d at 344-45.

The ALJ's improper application of the treating physician rule in the context of Plaintiff's psychiatric impairment and her failure to explain the decision not to assign any weight to the licensed clinical social worker's opinion constitute additional bases for remanding the case to the Commissioner. *See Pratts*, 94 F.3d at 39 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

## IV. CONCLUSION

Given (i) the improper application by the ALJ of the treating physician rule, the case is reversed and remanded to the Commissioner for further proceedings consistent with this Memorandum and Order. Plaintiff's motion for judgment on the pleadings is granted to the extent of her request for the case to be remanded but denied in all other respects. The Commissioner's motion for judgment on the pleadings is denied in all respects.

**SO ORDERED.**

s/SLT

/SANDRA L. TOWNES
United States District Judge

Dated: September 28, 2012
Brooklyn, New York